759 F.Supp. 560 (1991)
Douglas FRIESEN, Jr., Plaintiff,
v.
GENERAL MOTORS CORPORATION, Defendant.
No. 88-1573-C-5.
United States District Court, E.D. Missouri, E.D.
March 20, 1991.
*561 Paul W. Kopsky, Richard R. Vouga, Kopsky and Vouga, Chesterfield, Mo., for plaintiff.
James E. McDaniel, Robert Kaiser, Lashly, Baer & Hamel, St. Louis, Mo., for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff, Douglas Friesen, Jr. brought this action against General Motors Corporation ("GM") after it denied him a lump sum payment upon his voluntary resignation from his employment there. He has filed a complaint against GM under the Employment Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1132. Count I of plaintiff's first amended complaint seeks actual damages of $62,480.00 for an alleged violation of ERISA; Count II seeks attorneys fees.[1]
The case was set for trial on August 13, 1990. With the Court's consent, the parties agreed to submit this matter upon cross motions for summary judgment for determination on the merits. This Court, having now considered the pleadings, the motions for summary judgment with supporting exhibits and responses thereto, and the stipulation of the parties, hereby makes the following findings of fact and conclusions of law.

I. FINDINGS OF FACT
Plaintiff worked for GM from 1982 to 1987. GM is a Delaware corporation authorized to conduct business in Missouri and other states.
GM originally hired plaintiff as an hourly assembly employee at its Kansas City plant. After he worked his way up the company ladder, GM transferred him to Wentzville, Missouri, as a salaried employee in 1982. At Wentzville, plaintiff held various supervisory and managerial positions.
In November 1986, GM placed plaintiff on the management development program (MDP) list of "high potential" employees. In essence, this was a list of "rising stars." Management, through the Human Resources Management (HRM) Committee at the plant, monitored the progress of these individuals with an eye toward future advancement. Although "high potential" employees were not told they were on the list and were given no immediate special benefits, MDP employees were exempt from layoff.
GM did not place information about whether a particular employee was considered "high potential" in the personnel file which was open to inspection by the employee. GM did not inform MDP employees of their high potential status for *562 two reasons. First, GM wanted to observe these employees in a "natural" environment. Second, they wanted to avoid morale problems with employees not on the list, or with employees who may be removed from the list.
In mid-1986, GM instituted its Special Incentive Separation Program ("the SIS program"). GM initiated the SIS program to reduce the size of the salaried work staff by offering financial incentives to certain employees to voluntarily resign. The SIS program existed throughout the corporation, but was administered at the local plant level. Eligibility was determined on a unit basis; each plant constituted a unit.
At each plant, the HRM Committee made the final determination as to who was eligible for the SIS program. The HRM Committee members are, essentially, the "executive board" of the plant. They are a cross section of management employees who are intimately involved in the day-to-day operations of the plant and are responsible for ensuring the smooth operations of the plant.
GM introduced the SIS program to the Wentzville plant in September 1986. Originally, it was scheduled to terminate on August 1, 1987, but was extended at the Wentzville plant until December 31, 1987. From September 1986 until plaintiff terminated his employment with General Motors, plaintiff was advised on numerous occasions of the program. When GM began the program, it surveyed salaried employees to determine interest. Plaintiff chose not to respond. Notices were posted in the plant, descriptions of the SIS program were given to all employees, including plaintiff, and the SIS program was widely discussed among employees.
The general provisions of the SIS program state:
The program must be administered on a mutually agreeable basis. Management will select which individuals it wishes to approach, but the offer must be agreed to by the employe in writing. Employes are not barred from consideration if they, on their own initiative, indicate an interest, but, in such cases, management has the final decision as to whether it is in GM's best interest to separate the employe.
Plaintiff applied for participation in the SIS program on August 17, 1987. He was born July 5, 1957, so he was thirty years old at that time. As with all employees, he knew the amount of money he would receive if he were accepted into the SIS program. To apply, he signed a statement of acceptance of special incentive separation for the SIS program. The statement indicates that participation in the SIS program is "subject to necessary approvals." Plaintiff understood that phrase to require approval by the HRM committee before he would be eligible for SIS program benefits.
James J. Prendergast witnessed plaintiff's signature on the SIS program statement. At that time, Mr. Prendergast was general supervisor of salaried personnel administration at the Wentzville Assembly Center. He also was a member of the HRM committee.
On about August 26, 1987, the HRM Committee rejected plaintiff's application and told him it was because he was a "high potential" employee. Because MDP employees such as plaintiff showed potential for leadership positions and the HRM committee did not want to entice these individuals to leave its employment, the committee considered these individuals ineligible for the SIS program. Plaintiff first learned of his classification as a "high potential" employee when the committee rejected his application.
GM did not deny benefits to all employees on the high potential list. However, of the 5,434 participants in the SIS program throughout the corporation, only about twenty-eight received benefits while in the "high potential" classification. The HRM committees granted benefits to high potential employees for various reasons. Many received benefits because their plant was being totally shut down. Some received benefits because their particular positions were being eliminated. Others received benefits to avoid the layoff of a higher ranking employee. At the Wentzville center, *563 only two persons received SIS benefits while on the high potential list.
GM has a corporatewide program called the "open door" policy, allowing employees to seek redress of disputes with management decisions. With an appeal from the determination of management through GM's "open door," "the Vice President, Personnel Administration and Development Staff, ... will make the final determination for the Corporation."
The "open door" policy is not referred to in the SIS program documents and is not expressly stated to be geared toward handling review of GM decisions regarding the SIS programs. Although other employees used this procedure to challenge their denial of benefits, plaintiff denied that he knew about it. GM counters that he was told of this right at the time of the denial. In any event, plaintiff did not write a letter asking for review of his denial of SIS program benefits as the "open door" policy required.
Plaintiff submitted his resignation on September 14, 1987, effective September 10, 1987. He has given two reasons for resigning. First, he anticipated a reduction in force at Wentzville and, although he was not a likely candidate for layoff, he could have been demoted. Second, he had heard that GM was going to make him a line supervisor, which he perceived as having less potential for upward mobility.
Plaintiff began working for Toyota in Kentucky in September 1987 at a salary about ten percent higher than what he made at GM. He interviewed for the position in July 1987 and was offered a job later that month. He accepted that position in August 1987.
Despite numerous demands, GM has denied plaintiff participation in the SIS program and has not paid him benefits under the program. The parties agree that if he were granted benefits under the program, he would be entitled to a lump sum benefit of $62,480.00.

II. SUMMARY JUDGMENT STANDARD OF REVIEW
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop. Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the *564 Court turns to an examination of the relevant law.

III. CONCLUSIONS OF LAW
This Court has subject matter jurisdiction of this case pursuant to the provisions of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, et seq. Venue is proper in this Eastern Division of the Eastern District of Missouri as plaintiff was employed by defendant here and the transactions that are the basis of this lawsuit took place here.
The parties have stipulated that the SIS program is an employee benefit plan as defined in ERISA, 29 U.S.C. §§ 1001 et seq., and is subject to the provisions of ERISA. GM sponsored, administered and financed all aspects of the program. Plaintiff's claim for benefits under the SIS program is governed by § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). Title 29 U.S.C. § 1132(a)(1)(B) provides:
A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.
This section provides the exclusive remedy for a person claiming benefits under a plan within ERISA. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

A. Denial of Benefits

The resolution of this case turns on whether the decision to deny plaintiff benefits under the SIS program was in violation of the terms of the plan.
Before Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), a court reviewing the denial of ERISA benefits employed the arbitrary and capricious standard. Johnson v. Enron Corp., 906 F.2d 1234, 1237 (8th Cir.1990). In Firestone, however, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) of ERISA is to be reviewed under a de novo standard unless the benefits plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone, 109 S.Ct. at 956. If the benefit plan gives the administrator or fiduciary discretionary authority, then the Court may review the benefit determination under the arbitrary and capricious standard. Lakey v. Remington Arms Co., 874 F.2d 541, 544 (8th Cir.1989).
The plan at issue in this case provides:
The program must be administered on a mutually agreeable basis. Management will select which individuals it wishes to approach, but the offer must be agreed to in writing. Employes are not barred from consideration if they, on their own initiative indicate an interest, but, in such cases, management has the final decision as to whether it is in GM's best interest to separate an employe.
The language of the plan makes it clear that GM management retains the right to make the final decision as to whether an employee is eligible to participate in the SIS program. It was a special program to reduce the size of the salaried work staff by offering financial incentives to certain employees to voluntarily resign. The standard for eligibility is what is "in GM's best interest." It only makes sense that GM management must decide what is in "GM's best interest."
The plan gives GM management, as the administrator of the plan, discretion to interpret the terms of the plan and to determine eligibility for benefits. Therefore, GM's decision to deny benefits in this case is entitled to review under the arbitrary and capricious standard. Thus, the question for this Court is whether the decision not to allow plaintiff to participate in the SIS program was arbitrary and capricious.
Under the arbitrary and capricious standard the decision must be affirmed so long as it is reasonable. In fact, the Eighth Circuit has suggested that the arbitrary and capricious standard is less stringent than a reasonableness standard. Simmons v. Diamond Shamrock Corp., 844 F.2d 517, 522 (8th Cir.1988); Agee v. Armour Foods Co, 834 F.2d 144 (8th Cir.1987).

*565 1. Arbitrary and Capricious Analysis

It is a question of law, based on the evidence in the record, whether GM's denial of plaintiff's request for participation in the SIS program was arbitrary and capricious.
The HRM Committee at Wentzville had decided that plaintiff was a "rising star" within the company. He had worked his way up from an hourly assembly employee to being a salaried employee, holding various supervisory and managerial positions. He had received excellent annual performance evaluations. The HRM committee had placed him on a special list to be observed for management development potential. It considered plaintiff a "high potential" employee and did not want to induce one of their best workers to leave the company. GM's decision not to pay its best employees to leave is certainly reasonable.
These reasons are sufficient to show that GM's decision was not arbitrary and capricious. The SIS program was designed to allow GM to select which employees it would pay to voluntarily resign. The decision regarding participation in the SIS program was based on whether it was in GM's best interest to separate an employee. GM considered plaintiff one of its best employees and reasonably decided not to pay him to resign.
Absent a violation of federal law, the reasonableness of a participation requirement is not reviewable. Moore v. Reynolds Metals Co. Retirement Program, 740 F.2d 454, 456 (6th Cir.1984), cert. denied 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985); District 2, UMW v. Helen Mining Co., 762 F.2d 1155, 1160 (3rd Cir.1985); Short v. UMW 1950 Pension Trust, 728 F.2d 528 (D.C.Cir.1984). Plaintiff does not allege that participation requirements of the SIS program contravene other laws, such as Title VII, the Age Discrimination in Employment Act, or the National Labor Relations Act.
Plaintiff's complaint of discrimination is that some MDP employees received SIS benefits while he was denied participation. However, the fact that GM granted SIS program to some employees on the high potential list but not to others does not make the decision to deny plaintiff benefits arbitrary and capricious. It demonstrates that the HRM committee considered on a case-by-case basis whether paying a particular employee to resign was in the company's best interest.
Of the 5,434 participants in the SIS program throughout GM, only about twenty-eight received benefits while in the "high potential" classification. At Wentzville, only two persons received SIS benefits while on the high potential list. The HRM committees granted benefits to high potential employees for various reasons. Many received benefits because their plant was being totally shut down. Some received benefits because their particular positions were being eliminated. Others received benefits to avoid the layoff of a higher ranking employee.
In plaintiff's case, the Wentzville plant was not closing down. His position was not being eliminated. The decision not to pay him to leave cannot be considered arbitrary.
This Court previously examined this same GM SIS program. In Valz v. General Motors, Judge Nangle wrote:
[A]n employee may participate in the Program only if [GM] management first decides to permit the employee to participate.... [GM] unambiguously reserves to its management the unfettered right to make the decision as to whether it will offer a given employee the opportunity to participate in the Program.... Thus, [GM] reserves to its management the unfettered right not to agree to permit any particular employee to participate in the Program.
Valz v. General Motors Corp., No. 87-2098C(1), 1988 WL 182379 (E.D.Mo. April 25, 1988), aff'd, 871 F.2d 1094 (8th Cir.1988) (unpublished opinion) (quoted in Bair v. General Motors Corp., 895 F.2d 1094 (6th Cir.1990)).
The bottom line is that "[GM] unambiguously reserves to its management the unfettered right to make the decision as to whether it will offer a given employee the *566 opportunity to participate in the Program." Bair, 895 F.2d at 1097 (quoting Valz, supra). The decision to deny plaintiff benefits is reviewed under the arbitrary and capricious standard. GM's determination to deny plaintiff benefits was not arbitrary and capricious, because GM reasonably decided to retain one of its best employees rather than offering him incentives to resign.

2. De Novo Analysis

Although the Court has determined that the arbitrary and capricious standard is proper in this case, in the spirit of caution, the Court will make the following alternate conclusions of law under the de novo standard of review.
In a de novo review the Court ascertains the plaintiff's eligibility for benefits by looking to the terms of the plan and other manifestations of the parties' intent. Firestone, 109 S.Ct. at 955.
In this case, plaintiff signed a form titled "Acceptance of Special Retirement." Two other courts, in very similar cases, have examined the identical form and determined that it did not amount to a contract. See Bair, 895 F.2d at 1097-98; O'Neill v. Delco Products, et al., No. 89-CV-60108-AA (E.D.Mich. June 8, 1990) (unpublished opinion). This Court agrees.
... It is hornbook law that an enforceable contract arises upon the acceptance of an offer. An "offer" exists where the offeree can reasonably conclude that, based on the objective facts, an offer has been made. "Acceptance" is "a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." Although the form signed by [plaintiff] is replete with language proclaiming it to be an "offer" and the [plaintiff's] signature constitutes "acceptance" of its terms, viewed in context it is clear that its contract-like terms do not, in substance, make it a contract.
The form states that "[implantation] of this special retirement is subject to the necessary approvals," indicating that signing the form alone is not sufficient to give rise to an enforceable agreement.... The provision in the Acceptance form clearly indicated that actual participation in the Program could only occur upon receiving the necessary corporate approval. Merely signing the form did not create a contract, since GM reserved the right to deny any particular employee participation.
Bair, 895 F.2d at 1097-98 (citations omitted).
Furthermore, in his deposition, plaintiff acknowledged that he understood the phrase "subject to necessary approvals" to require approval by the HRM committee before he would be eligible for SIS program benefits. Thus, the intent of the parties was that plaintiff be considered for the SIS program and that he "had a right to the benefits provided by the program only if defendant's management first agreed to permit plaintiff to participate in the Program." Valz at p. 3.
The plan reserved to GM management "the unfettered right not to agree to permit any particular employee to participate in the Program." Id. at 2. GM considered plaintiff a "high potential" employee. His position was not being eliminated. The HRM committee determined it was not "in GM's best interests" to allow plaintiff to participate in the SIS program. Therefore, under the plan, plaintiff was not entitled to benefits.

B. Procedural Violations

Plaintiff also suggests certain procedural violations of the ERISA. He claims GM used "secret criteria" in granting or denying SIS program benefits and that no proper review procedure existed.
While it is true that no document is titled "summary plan description," the written materials provided to employees explain why the SIS program was developed, the eligibility requirements, how they would apply, the formula for calculating benefits and the effective date of the program. The plan stated its purpose and that the standard for eligibility was "GM's best interests." Plaintiff applied for participation in the SIS program and knew that his acceptance required approval from the HRM committee. It is irrelevant that *567 the "high potential" designation was secret because the committee had the absolute right to determine who would participate in the program.
It is also true that the review procedure of the "open door" policy is not referred to in the SIS program documents and is not expressly stated to be geared toward handling review of decisions regarding the SIS program. However, other employees challenge their denial of benefits through this procedure, and GM told plaintiff of this right when it denied him participation in the program.
This case is distinguishable from Blau v. Del Monte Corp., 748 F.2d 1348 (9th Cir. 1984), cert. denied, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). In Blau, the employer actively concealed its severance allowance policy and failed to publish or in any way inform salaried employees of its existence, content, or terms. Blau, 748 F.2d at 1351.
This case is far from the extreme situation in Blau. See also Simmons, 844 F.2d at 524-25 (distinguishing Blau). Here, GM did not conceal the SIS program from employees. GM widely distributed materials about the SIS program. Plaintiff was well aware of its existence. He knew how to apply for benefits and how much he would receive if he were approved. Plaintiff knew his application for benefits was subject to approval of the HRM committee.
Plaintiff simply has failed to show any substantive harm from any failure of GM to follow the technical and procedural requirements of ERISA. Cf. Blau, 748 F.2d at 1354.
Accordingly,
The Court concludes that defendant has established both the absence of any genuine issues of material fact and that it is entitled to judgment as a matter of law. Therefore, defendant is entitled to summary judgment and defendant's motion for summary judgment will be granted. Plaintiff's motion for summary judgment will be denied.
NOTES
[1] On April 5, 1989, the Court granted defendant's motion to dismiss Count III for punitive damages.